**ROBERT T. EGLET, ESQ.**
Nevada Bar No. 3402
**ROBERT M. ADAMS, ESQ.**
Nevada Bar No. 6551
**ERICA D. ENTSMINGER, ESQ.**
Nevada Bar No. 7432
**EGLET PRINCE**
400 South Seventh Street, Suite 400
Las Vegas, Nevada 89101
Telephone:  (702) 450-5400
Facsimile:  (702) 450-5451
Email:  eservice@egletwall.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

AURANGZEB NAGY, individually and on behalf of all those similarly situated, ROBERT VANNAH, individually and on behalf of all those similarly situated; GEORGE KLEANTHIS, individually and on behalf of all those similarly situated, ZANETTA KLEANTHIS, individually and on behalf of all those similarly situated,

    Plaintiffs,

vs.

FACEBOOK, INC., a foreign corporation; MARK ZUCKERBERG, an individual, DAVID WEHNER, an individual, SHARON SANDBURG, an individual, CHRISTOPHER COX, an individual, MICHAEL TODD SCHROEPFER, an individual, JAS ATHWAL, an individual, COLIN STRETCH, an individual, JAN KOUM, an individual, DAVID FISCHER, an individual, and DOES 1 though 20, inclusive.

    Defendants.

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs, individually and on behalf of all those similarly situated, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other

things, their counsel's investigation, which includes without limitation, review and analysis of Securities and Exchange Commission ("SEC") filings, press releases and media reports issued by and disseminated by Defendant Facebook, Inc. ("Facebook" or the "Company") and review of other publicly available information concerning Facebook. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1.     Plaintiffs bring this action as a class action on behalf of themselves and on behalf of all persons who held or purchased the publically held common stock of Facebook between April 1, 2015 through November 16, 2016, inclusive (the "Class Period").  The claims asserted in this action arise under the Securities and Exchange Act of 1934 (the "Exchange Act") and brought against Facebook and executives Zuckerberg, Wehner, Sandburg, Cox, Schroepfer, Athwal, Stretch, Koum, and Fischer (the "Individual Defendants")(collectively referred to with Facebook as the "Defendants").

2.     Upon information and belief, Facebook has more than 1.7 billion users, and has made paid advertising a central component of its growth strategy, and its significant growth in mobile advertising has been driven by strong demand for video advertisements.

3.     On or about May 2014, Facebook introduced new advertising and content "metrics" designed to, among other things, to help advertisers "better understand how people respond to [their] videos on Facebook," to measure results from its paid advertising products, and to allow advertisers to measure the performance of their Facebook ads and campaigns.

4.     Facebook touted its advertising metrics as a valuable tool for measuring the success of paid advertisements, but had no third-party to independently monitor or evaluate the

data derived from the advertising metrics, or to verify the accuracy of the metrics data, despite heavy criticism from ad companies to be more transparent.

5.     On or about April, 2015, Facebook internally began to discover errors with the calculation of the advertising and content metrics, but concealed such information from the public and failed to include it in SEC filings.

6.     With knowledge of the faulty metrics, the Individual Defendants began selling off substantial shares in Facebook at a profit.

7.     On or about September 17, 2015, Facebook announced that it would let ad companies utilize third-party software from analytics firm, Moat, Inc., to analyze ad metrics on Facebook.

8.     On December 1, 2015, Individual Defendants began implementing a plan to liquidate their Facebook stock while also maintaining majority voting power via a three (3) to one (1) stock split.  Class A and Class B shareholders would receive two (2) additional share of a new Class C stock that holds no voting power.

9.     In or about January 2016, Moat, Inc. began analyzing ad metrics data independently from Facebook's own metrics.

10.     On or about June 20, 2016, Facebook shareholders approve a three (3) to one (1) stock split, creating new nonvoting Class C shares.

11.     On or about August, 2016, Moat, Inc. discovers a miscalculation in Facebook's ad metrics, and Facebook alerts its advertising customers privately of a possible miscalculation in its ad metrics.

12.     On or about September 23, 2016, Facebook publically admitted that it found an error in its video advertising metric that inflated the duration measurement of paid video

advertisements, but downplayed its significance, provided contradictory information regarding the error, and failed to disclose additional errors in the Facebook metrics.

13.     Facebook did not alert investors of the substantial affect the miscalculation would have on ad revenue in the future.

14.     On or about September 30, 2016, Facebook filed in quarterly earnings statement with the Securities Exchange Commission ("SEC").  The statement did not include any mention of the ad metric miscalculation, nor its likely affect on ad revenue, which comprised approximately 97% of Facebook's revenue for 2016.

15.     On or about October 2016, Facebook makes additional reports of more ad metrics being miscalculated.

16.     On or about November 3, 2016, Facebook announces that it expects a significant decrease in ad revenue, and growth in the coming year, and that the company expects to significantly increase capital investment by taking on more debt.

17.     The price of Facebook stock began its decline following the November 3, 2016, announcement of expected reduction in ad revenue, and capital expenditures.  The value of Facebook stock fell $4 billion dollars between November 3, 2016, and November 4, 2016.

18.     Once the truth regarding the ad metrics was revealed, and the expected impact the error would have on Facebook's future revenue, stock prices continued to drop significantly resulting in significant losses to Facebook shareholders.

19.     On November 18, 2016, Defendant Zuckerberg announced Facebook's first ever buyback of Class A voting stock set to be implemented starting in January 2017.

20.     On November 18, 2016, Facebook announces that their Chief Accounting Officer, Jas Athwal has resigned.

4

21.     As a direct result of Defendants' false statements and omissions, shareholders purchased or held Facebook stock believing that the Company had the ability to sustain growth in paid advertising, and could successfully execute its paid advertising plan and related metrics. All the while, however, Defendants knew that significant errors with the Facebook metrics were inflating and misrepresenting the volume and duration of Facebook ad views, and that the eventual disclosure of such errors would result in plunging ad sales.

## II.     JURISDICTION AND VENUE

22.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C.§§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

24.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District, and Defendants have engaged in continuous and systematic business operations within the State of Nevada, and maintains such minimum contacts with Nevada to make this Court's exercise of jurisdiction proper.

25.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone and electronic communications, and the facilities of a national securities exchange.

## III.     PARTIES

26.     Plaintiffs purchased or held Facebook stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

27.     Defendant Facebook, Inc. ("Facebook") is a publicly traded U.S. company incorporated in Delaware, with its principal place of business at 1 Hacker Way, Menlo Park, CA 94025.

28.     Defendant Mark Zuckerberg is the founder and Chief Executive Officer of Facebook, and during the Class Period sold millions of shares of the Company, while in possession of adverse undisclosed information about the Company.

29.     Defendant David Wehner is the Chief Financial Officer of the Company and sold tens of thousands of shares of Facebook stock during the Class Period, while in possession of adverse undisclosed information about the Company.

30.     Defendant Sharon Sandburg is the Chief Operating Officer of the Company and sold hundreds of thousands of shares of Facebook stock during the Class Period, while in possession of adverse undisclosed information about the Company.

31.     Defendant Christopher Cox is the Chief Product Officer of the Company and sold tens of thousands of shares of Facebook stock during the Class Period, while in possession of adverse undisclosed information about the Company.

32.     Defendant Michael Todd Schroepfer is the Chief Technology Officer and sold tens of thousands of shares of Facebook stock during the Class Period, while in possession of adverse undisclosed information about the Company.

33.     Defendant Jas Athwal is the Chief Accounting Officer of the Company and sold thousands of shares of Facebook stock during the Class Period, while in possession of adverse undisclosed information about the Company.

34.   Defendant Colin Stretch is the Vice President and General Counsel of the Company and sold tens of thousands of shares of Facebook stock during the Class Period, while in possession of adverse undisclosed information about the Company.

35.   Defendant Jan Koum is a Director of the Company who sold millions of shares of Facebook stock during the Class Period, while in possession of adverse undisclosed information about the Company.

36.   Defendant David Fischer is a Vice President of the Company and sold tens of thousands of shares of Facebook stock during the Class Period, while in possession of adverse undisclosed information about the Company.

37.   The Individual Defendants, because of their positions with the Company possessed the power and authority to control and did control the contents of Facebooks's public reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. These Individual Defendants were quoted in and/or provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were intentionally being concealed from, the public, and that the positive representations, which were being made were then materially false and/or misleading.

38.   Plaintiff Aurangzeb Nagy is a resident of Clark County, Nevada who purchased or held shares of Facebook during the Class Period.

39.   Plaintiff Robert Vannah is a resident of Clark County, Nevada who purchased or held shares of Facebook during the Class Period.

7

40.     Plaintiff George Kleanthis is a resident of DuPage County, Illinois who purchased or held shares of Facebook during the Class Period.

41.     Plaintiff Zanetta Kleanthis is a resident of DuPage County, Illinois who purchased or held shares of Facebook during the Class Period.

**IV.     GENERAL ALLEGATIONS**

42.     Facebook operates www.facebook.com ("Website"), a social networking website that allows registered users to create profiles, upload photos and videos, send messages and keep in touch with friends, family and colleagues.

43.     Facebook is essentially an advertising company that connects sellers and advertisers of consumer goods and services with its consumer users with the purpose of generating revenue, achieved primarily through the sale of advertising targeted at its consumer users.

44.     To further its financial objectives, Facebook provides business services through the Website to serve as a resource for businesses that want to use Facebook for marketing and advertising.

45.     Facebook's advertising products comprised 97% of Facebooks revenue for 2016, generating billions of dollars in revenue by displaying advertisements to Facebook users.  In this process, millions of American advertisers paid substantial sums of money for advertising based on Facebook's representations of how many consumers can be reached and influenced by advertisements that appear on the Website.

46.     Facebook generates revenue by selling advertisement placements over its website and mobile applications to sellers of consumer goods and services to help them reach consumers on the Website based on user information appropriated by Facebook. As such, Facebook enables companies to target consumers based on a variety of factors such gender, age, network, profile

8

keywords, relationship status, all based on the manner in which the consumer interacts with the Facebook website.

47.     Upon information and belief, Facebook's single most important revenue source is advertising and Facebook has generated billions in its history, the majority of which comes from advertising, including mobile advertising. During the last three months of 2015, as reported by Facebook in January 2016, Facebook brought in $5.8 billion, $1.6 billion of which was profit generated largely from advertising revenue.

48.     Substantially all of Facebook's growth between 2014 and 2016 was based on paid advertisements that are placed on Facebook by advertisers to advertise business ideas and/or products by specifically targeting the millions of American consumers using the Website.

49.     On or about May 2014, Facebook introduced new advertising and content "metrics" designed to, among other things, measure results from its paid advertising products, and to allow advertisers to measure the performance of their Facebook ads and campaigns.

50.     Facebook touted its advertising metrics as a valuable for tool for measuring the success of paid advertisements, but had no third-party to independently monitor or evaluate the data derived from the advertising metrics, or to verify the accuracy of the metrics data.

51.     On or about May 4, 2014, the Website's business page touted the "video metrics" as providing advertisers with information "like video views, unique video views, the average duration of the video view and audience retention," and promoted the new metrics as being "designed to help you learn what's resonating with people and determine how to more effectively create and promote your videos on Facebook."

52.     During the Class Period, advertisers continued to purchase advertisements from Facebook in increasing numbers, and continued to rely upon Facebook metrics and "measuring

9

tools" to monitor the reach and success of their advertisements and to measure the volume and duration of their Facebook ad views.

53.    In February 2015, Facebook announced that it had reached two million active advertisers with most of the gain coming from small businesses. In March 2016, Facebook announced that it reached three million active advertisers with more than 70% from outside the United States.[1]  According to 2015 figures from market-research website eMarketer, the average Facebook user generates $12.76 in yearly advertising revenue for Facebook, up from $10.03 in 2014. That figure is expected to rise still further, up to $17.50 in 2017.[2]

54.    In February 2015, Facebook continued to try to attract advertisers by representing that, "[w]ith Facebook measurement tools, you'll see how people respond to your page and advertisements, so you can make informed decisions about reaching your customers."

55.    In or about April 17, 2015, Facebook began to analyze the data from the advertising metrics and measurement tools, and discovered that Facebook had been miscalculating several of the metrics it uses to measure how content performs.

56.    Shortly thereafter, the Individual Defendants began to sell off Facebook stock in unprecedented quantities.[3]

57.    Although Defendants embarked on their fraudulent scheme to conceal the Company's erroneous metrics by no later than the beginning of the Class Period, the market did learn the full extent of the problem until on or about November 16, 2016.

58.    In or about April 2015, Facebook discovered errors in its advertising and measurement tools that artificially inflated the viewing results of Facebook ads.

---

1. https://www.facebook.com/business/news/3-million-advertisers.
2. http://www.emarketer.com/Article/Social-Network-Ad-Revenues-Accelerate-Worldwide/1013015
[3] http://www.nasdaq.com/symbol/fb/insider-trades/sells

59.   On September 17, 2015, Facebook announced that ad companies would be permitted to use software from third-party analysis firm, Moat, Inc., to collect Facebook user data and analyze independent ad metrics.

60.   In or about January 2016, third-party Moat began to independently analyze the user data from Facebook to contrast with Facebook's own advertising metrics and measurement tools.

61.   On or about June 20, 2016, Facebook shareholders vote to approve a stock split.

62.   On or about August 23, 2016, Facebook began to privately alert certain ad customers of possible errors in the advertising metrics.

63.   On or about September 23, 2016, Facebook posted the following admission to its Facebook business page:

> We found an error in the way we calculate one of the video metrics on our dashboard – average duration of video viewed. The metric should have reflected the total time spent watching a video divided by the total number of people who played the video. But it didn't – it reflected the total time spent watching a video divided by only the number of "views" of a video (that is, when the video was watched for three or more seconds). And so the miscalculation overstated this metric.

64.   As a result of the faulty metric, Facebook inflated the duration measurement by only counting a video duration advertisement as "viewed" if it had been seen for more than 3 seconds, and excluded from the calculation instances when a viewer either did not watch the video or watched the video for less than 3 seconds.

65.   Facebook also admitted to the *Wall Street* Journal that as a result of its error in calculating the video metrics, Facebook reported for two years that the average time users spent watching videos was "artificially inflated by 60% to 80%."

11

66.     On or about September 30, 2016, Facebook issued its quarterly statements, but omitted any mention of the metric errors, possible litigation, or revenue losses resulting from the faulty advertising metrics.

67.     On October 21, 2016, Facebook reported yet another flaw in its advertising metrics that impacted the reporting of engagement counts in Page insights.

68.     While the market seemingly started to understand that Facebook's advertising metrics could be unreliable and unverified, the full extent of the Company's misrepresentations had not yet come to light.

69.     On or about November 3, 2016, Facebook announced significantly decreased future revenue from ads, and increased capital expenditures expected in 2017.

70.     On or about November 4, 2016, the value of Facebook shares begins to drop significantly resulting in $4 billion in losses.

71.     On or about November 16, 2016, Facebook discloses additional faulty metrics, and announces that it is updating its metrics to provide "more clarity" and "confidence about the insights we provide." Facebook also announced "Increased Third-Party Verification," and a "new internal review process to ensure our metrics are clear and up to date as our product offerings continue to evolve."

72.     On November 18, 2016, Defendant Zuckerberg announces the Company's first ever buyback of class A stock, and announces that Facebook's Chief Accounting Officer Jas Athwal will resign.

73.     Defendants made numerous materially false and misleading statements and omissions to investors during the Class Period regarding the Company's advertising metrics, and its business and financial results and outlook.

74.    These statements were knowingly false when made. Defendants knew, but concealed from the investing public during the Class Period that Facebook's advertising metrics were flawed and providing advertisers with inflated statistics regarding the amount of activity their ads received.

75.    The timing and magnitude of the decline in the price of Facebook stock negates any inference that the losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic factors or Company-specific facts unrelated to defendants' fraudulent conduct.

76.    As a result of Defendants' illegal conduct, Plaintiffs, on behalf of themselves and the Class, seek statutory penalties, actual damages, attorneys' fees, costs of suit, and any additional legal or equitable relief the Court deems appropriate.

**NO SAFE HARBOR**

77.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Facebook who knew that those statements were false when made.

13

## V.    CLASS ACTION ALLEGATIONS

78.    Class Definition: That Plaintiffs bring this nationwide class action on behalf of themselves and the class defined as follows:  All persons or entities who, from April 1, 2015 through November 16, 2016, ("Class Period") purchased (the "Purchasers") and/or held (the "Holders") any shares of Facebook public common stock, which shares were harmed or adversely affected by material omissions in corporate filings and in market timing in the stocks, during the Class Period. Excluded from the Class are defendants, members of the immediate families of the individual defendants, and their legal representatives, parents, affiliates, heirs, successors or assigns and any entity in which defendants have or had a controlling interest, and any other person who engaged in the wrongful conduct alleged herein (the "Excluded Persons").

79.    Numerosity: Upon information and belief, Plaintiffs allege that the total number of Class members is dispersed across the United States, and the stock was actively traded on the NYSE during the Class Period. Consequently, joinder of the individual Class members would be impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Class such that the disposition of the individual claims of the respective Class members through this Class action will benefit both the parties and this Court, and will facilitate judicial economy.

80.    Ascertainability: The Class is ascertainable because, on information and belief, Defendant keeps and collects the information of each Class member in a detailed electronic database and records.

81.    Typicality: Plaintiffs' claims are typical of the claims of the members of the Class. The claims of Plaintiffs' and the members of the Class are based on the same legal theories and arise from the same unlawful conduct. As such, the claims of Plaintiffs and the

1    Class rise and fall together and are typical of one another.

2        82.    <u>Common Questions of Fact and Law Predominate</u>: There are numerous questions

3 of law or fact common to all Class members including, but not limited to:

4

5          a.    Whether the federal securities laws were violated by Defendants' acts as alleged

6            herein;

7          b.    Whether statements made by Defendants to the investing public during the Class

8            Period misrepresented and/or omitted material facts about the business, operations

9            and management of Facebook;

10          c.    Whether the Individual Defendants caused Facebook to issue false and misleading

11

12            statements during the Class Period;

13          d.    Whether Defendants acted knowingly or recklessly in issuing false and

14            misleading financial statements;

15          e.    Whether Plaintiffs and the other members of the Class sustained damages because

16

17            of defendants' conduct, and the appropriate measure of damages; and

18          f.    Whether Defendants acted in an intentional, willful or wanton manner justifying

19            an award of punitive damages.

20        These questions are susceptible to a common answer. These questions and others like

21 them predominate over individual issues. The same evidence needed to prove Plaintiffs'

22

23 individual claims will be used to prove the claims of all Class members.

24        83.    <u>Adequacy of Representation</u>: Plaintiffs are adequate representatives of the Class

25 because their interests do not conflict with the interests of the members of the Class. Plaintiffs

26

27 will fairly, adequately, and vigorously represent and protect the interests of the members of the

28 Class and have no interests antagonistic to the members of the Class. Plaintiffs have retained

counsel who are competent and experienced in the prosecution of complex consumer class action

litigation. Plaintiffs' attorneys have the resources, expertise and experience to prosecute this action, and do not have knowledge of any conflicts among the members of Plaintiffs' Class, or any conflicts between the Class and Plaintiffs' attorneys.

84.    Superiority: The Class action is superior to other available methods for the fair and efficient adjudication of this controversy because: (a) the prosecution of a multitude of separate actions would be inefficient and wasteful of judicial resources; (b) the members of the class may be scattered throughout the country and are not likely to be able to vindicate and enforce their rights unless this actions is maintained as a class action; (c) the issues raised can be more fairly and efficiently resolved in the context of a single action rather than piece-meal litigation in the context of separate actions; (d) the resolution of litigation in a single forum will avoid the danger and resultant confusion of possible inconsistent determinations; (e) the prosecution of separate actions would create the risk of inconsistent or varying adjudications with respect to individuals pursuing claims against Defendants, which would establish incompatible standards of conducts for Defendants; (f) Defendants have acted and will act on grounds applicable to all Class members; and (g) questions of law and/or fact common to members of the Class, especially on issues of liability, predominate over any question, such as that of individuals damages that will affect individual Class members.

## APPLICABILITY OF THE PRESUMPTION
## OF RELIANCE: FRAUD ON THE MARKET

85.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.   The omissions and misrepresentations were material;

16

   c.  Facebook stock was traded in an efficient market during the Class Period;

   d.  The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Facebook stock; and

   e.  Plaintiffs and members of the Class purchased or held Facebook stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

   f.  Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

86. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**ADDITIONAL SCIENTER ALLEGATIONS**

87. As alleged herein, Defendants acted with scienter in that each of them knowingly or recklessly participated in a scheme to defraud Plaintiffs and other purchasers and holders of the stock and profited from their participation in said scheme, as alleged herein.

88. Each of the Defendants knew that ongoing errors in Facebook metrics were miscalculating how paid advertising was performing resulting in inaccurate and unreliable data, the disclosure of which would result in the devaluation of the market price of Facebook stock.

89. Each of the Defendants knew that failure to disclose the errors in the Facebook metrics would be enormously harmful to shareholders, including Plaintiffs and the other members of the Class.

90.    Each of Defendants was highly motivated to participate in the wrongdoing alleged herein, pursuant to which they were able to sell their Facebook shares at a cost much higher than their value once the metrics errors were disclosed.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### VIOLATION OF SECTION l0(b) OF THE EXCHANGE ACT AND SEC RULE l0b-5 PROMULGATED THEREUNDER ON BEHALF OF PURCHASERS

**[Against all Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5]**

91.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

92.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

93.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business, which operated as a fraud and deceit upon Plaintiffs and other Purchasers; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Purchasers as alleged herein, in an effort to enrich themselves through undisclosed manipulative trading tactics in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5; (ii)

18

manipulated the market price of Facebook stock during the Class Period such it did not reflect the risks and costs of the continuing course of conduct alleged herein; and (iii) cause Plaintiffs and other Purchasers to purchase or otherwise acquire Facebook stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

94.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Facebook stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Facebook's operations.

95.     By virtue of their positions at Facebook, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and other Purchasers, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Such acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

96.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Facebook, the Individual Defendants had knowledge of the details of Facebook's internal affairs.

19

97.    The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in the manipulative scheme, and/or a continuous course of conduct to conceal adverse material information about Facebook's operations, as alleged herein.

98.    The Individual Defendants employed devices, schemes and artifices to defraud and a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from secretly timed trading of Facebook stock and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the Purchasers.

99.    The Individual Defendants are also liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Facebook. The Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Facebook's operations. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Facebook stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Facebook's operations, Plaintiffs and the other members of the Class purchased or otherwise acquired Facebook stock at artificially inflated prices, and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

100.    During the Class Period, Facebook stock was traded on an active and efficient market. Plaintiffs and other Purchasers, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Facebook stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other

members of the Class known the truth, they would not have purchased or otherwise acquired those securities, or would not have purchased or otherwise acquired them at the inflated prices they paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Facebook's stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Facebook stock declined sharply upon public disclosure of the facts alleged herein, resulting in injury to Plaintiffs and other Purchasers.

101.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

102.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of Facebook stock during the Class Period, upon the disclosure that the Company had been disseminating false statements to the investing public.

## SECOND CLAIM FOR RELIEF

### VIOLATION OF SECTION l0(b) OF THE EXCHANGE ACT
### AND SEC RULE l0b-5 PROMULGATED THEREUNDER ON BEHALF OF HOLDERS

**[Against all Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5]**

103.    Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

104.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

105.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business, which operated as a fraud and deceit upon Plaintiffs and the

other Holders; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Holders as alleged herein, in an effort to enrich themselves through undisclosed manipulative trading tactics in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5; (ii) manipulated the market price of Facebook stock during the Class Period such it did not reflect the risks and costs of the continuing course of conduct alleged herein; and (iii) cause Plaintiffs and other Holders to hold Facebook stock, which they would not have, had they known of the wrongful conduct alleged herein. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

106.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Facebook stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Facebook's operations.

107.    By virtue of their positions at Facebook, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and other Holders, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Such acts and omissions of Defendants were

committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

108.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Facebook, the Individual Defendants had knowledge of the details of Facebook's internal affairs.

109.    The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in the manipulative scheme, and/or a continuous course of conduct to conceal adverse material information about Facebook's operations, as alleged herein.

110.    The Individual Defendants employed devices, schemes and artifices to defraud and a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from secretly timed trading of Facebook stock and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and other Holders.

111.    The Individual Defendants are also liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Facebook. The Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Facebook's operations. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Facebook stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Facebook's operations, Plaintiffs and the other members of the Class purchased or otherwise acquired Facebook stock at artificially inflated prices, and relied upon the price of

23

the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

112.     During the Class Period, Facebook stock was traded on an active and efficient market. Plaintiffs and other Holders, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Facebook stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other Holders known the truth, they would not have continued to hold Facebook stock, had they known of the wrongful conduct alleged herein. During the Class Period, the true value of Facebook's stock was substantially lower than the market reflected.  Plaintiffs and the other Holders, held onto their Facebook stock during the Class Period, and were damaged thereby when the market price of Facebook stock declined sharply upon public disclosure of the facts alleged herein, resulting in injury to Plaintiffs and other Holders.

113.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

114.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other Holders suffered damages in connection with their respective purchases, acquisitions and sales of Facebook stock during the Class Period, upon the disclosure that the Company had been disseminating false statements to the investing public.

### THIRD CLAIM FOR RELIEF

**AGAINST INDIVIDUAL DEFENDANTS FOR CONTROL PERSON LIABILITY UNDER SECTION 20(A) OF THE EXCHANGE ACT**

115.     Plaintiffs hereby incorporate by reference all of the allegations set forth above as

though fully set forth hereafter.

116.    During the Class Period, the Individual Defendants participated in the operation and management of Facebook, and conducted and participated, directly and indirectly, in the conduct of Facebook's business affairs. Because of their senior positions at the Company, they knew the adverse non-public information about Facebook's misstatement of income and expenses and false financial statements.

117.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Facebook's financial condition and results of operations, and to correct promptly any public statements issued by Facebook, which had become materially false or misleading.

118.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings, which Facebook disseminated in the marketplace during the Class Period concerning SunEdison's results of operations.

119.    Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Facebook to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Facebook within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged that manipulated the market price of Facebook stock during the Class Period such it did not reflect the risks and costs of the continuing course of conduct alleged herein. Each of the Individual Defendants, therefore, acted as a controlling person of Facebook.

120.    By reason of their positions as senior management and/or directors of Facebook, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Facebook to engage in the unlawful acts and conduct complained of herein. Each of the

Individual Defendants exercised control over the general operations of Facebook and possessed the power to control the specific activities, which comprise the primary violations about which Plaintiffs and the other members of the Class complaint.

121.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Facebook.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and those similarly situated pray for relief and damages as follows:

A.   That the Court determine this action is a proper class action and appoint Plaintiffs as representatives of the Class under Rule 23 of the Federal Rules of Civil Procedure;

B.   That Plaintiffs and the Plaintiffs' Class be awarded general and special damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial;

C.   That Plaintiffs and the Plaintiffs' Class be awarded punitive damages,

D.   That Plaintiffs and the Plaintiffs' Class be awarded reasonable attorney's fees and be awarded their costs of court;

E.   That Plaintiffs and the Plaintiffs' Class be awarded pre-judgment and post-judgment interest.

F.   That Plaintiffs and the Plaintiffs' Class be awarded any other equitable/injunctive relief as the Court may deem proper.

//

//

//

//

//

## DEMAND FOR JURY TRIAL

Plaintiffs and the Plaintiffs' Class hereby demand a trial by jury for all issues so triable.

DATED this 22nd day of November, 2016.

Respectfully submitted,

**EGLET PRINCE**

/s/ Robert T. Eglet
ROBERT T. EGLET, ESQ.
ROBERT M. ADAMS, ESQ.
ERICA D. ENTSMINGER, ESQ.
400 South Seventh Street, Box 1, Suite 400
Las Vegas, Nevada 89101